CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 17 2020

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DERWIN L.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:18-cv-00048 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| ANDREW M. SAUL,[2] | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Derwin L. asks the Court to review the Commissioner of Social Security's final

decision denying his claims for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§

401–434, 1381–1383f. The case is before me under 28 U.S.C. § 636(b)(1)(B). ECF No. 13.

Having considered the administrative record, the parties' briefs, and the applicable law, I find

that the Commissioner's final decision is supported by substantial evidence and should be

affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby
substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this
action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

2

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 426.920(a)(4).[3] The claimant

bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden

shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In November 2013, Derwin filed for DIB and SSI alleging that he was disabled by

epilepsy, depression, anxiety, and high blood pressure. *See* Administrative Record ("R.") 103,

112, 255–56, 257–63, ECF No. 10. Derwin was forty-six years old, or a "younger person" under

the regulations, when he allegedly became disabled on September 23, 2013. R. 103; 20 C.F.R. §§

404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied

his claims initially in March 2014, R. 103–22, and upon reconsideration that October, R. 123–62.

In January 2017, Derwin appeared with counsel and testified at an administrative hearing before

ALJ Mark O'Hara. *See* R. 25; 57–102. Derwin's mother and a vocational expert ("VE") also

testified at this hearing. *See id.*

ALJ O'Hara issued an unfavorable decision on July 12, 2017. R. 25–39. He found that

Derwin "had the following severe impairments (at least in combination): obesity, seizure

disorder, anxiety, and depression." R. 28. Those impairments did not meet or equal the relevant

Listings. *See* R. 28–30 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.02, 12.04, 12.06).

Turning to Derwin's residual functional capacity ("RFC"), ALJ O'Hara found he could perform

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

"medium work"[4] involving only occasional postural activities; no climbing ladders, ropes, or scaffolds; and no concentrated exposure to workplace hazards or respiratory irritants. R. 31. Derwin also "retain[ed] the concertation, persistence, and pace to perform simple, repetitive work that [did] not require working with the public." *Id.* Based on this RFC and the VE's testimony ALJ O'Hara concluded at step five that Derwin was not disabled after September 2013 because he still could perform six "light"[5] to "medium" unskilled occupations that offered a significant number of jobs in the national economy. R. 38–39; *see* R. 94–97. The Appeals Council denied Derwin's request to review that decision, R. 1, and this appeal followed.

## III. Discussion

Derwin challenges how ALJ O'Hara weighed conflicting medical-source opinions as part of the RFC assessment. *See* Pl.'s Br. 3–5, ECF No. 16-1. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite all his medical impairments and related symptoms.[6] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect any credibly established "functional limitations . . . caused by medical impairments and their related symptoms" that affect the

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," 20 C.F.R. §§ 404.1567(c), 416.967(c), plus standing, walking, and/or sitting for about six hours in an eight-hour workday, SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). *See* R. 31. A person who can do "medium" work can also do less-demanding "light" work. 20 C.F.R. §§ 404.1567(c), 416.967(c); *see* R. 38.

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. §§ 404.1567(b), 416.967(b), plus standing, walking, and/or sitting for about six hours in an eight-hour workday, *see* SSR 83-10, 1983 WL 31251, at *5–6. R. 31.

[6] "Symptoms" are the claimant's own description of his medical condition. 20 C.F.R. §§ 404.1502(i). 416.902(n).

claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad discretion to decide whether an alleged symptom or functional limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a court will affirm the ALJ's RFC findings when it is clear he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and his written decision built an "accurate and logical bridge from that evidence to his conclusion" that the claimant is not disabled, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up).

*

Derwin argues ALJ O'Hara should have given more weight to opinions from treating neurologist Victor Owusu-Yaw, M.D., and consultative examiner Emilie Storch, Ph.D., and should not have credited the DDS reviewing physician's medical opinion that he had "moderate" overall limitations with social functioning and maintaining concentration, persistence, or pace. *See* Pl.'s Br. 3–6 (citing R. 35–36, 133, 444, 465–73, 498). Medical opinions are statements from "acceptable medical sources," like physicians and psychologists, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to each medical opinion in the claimant's record, taking into account relevant factors like the nature and

5

extent of the provider's treatment relationship with the claimant; how well he or she explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the provider's medical specialty. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions from treating and examining sources typically deserve more weight than those from non-examining sources, such as the DDS medical reviewers. *Id.*; *Brown*, 873 F.3d at 268.

Medical opinions are different than a medical professional's opinion about "issues reserved to the Commissioner," including whether a person is "'disabled or 'unable to work.'" 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Morgan v. Barnhart*, 142 F. App'x 716, 721–22 (4th Cir. 2005). An ALJ is not required to give special deference to a physician's legal conclusions, *Morgan*, 142 F. App'x at 722, or other "administrative findings . . . that would direct the determination or decision of disability" in a case, 20 C.F.R. §§ 404.1527(d), 416.927(d).

A.    *Dr. Owusu-Yaw*

Derwin first argues that ALJ O'Hara misapplied the "treating physician rule" because he "failed to give proper controlling weight" to Dr. Owusu-Yaw's statements that Derwin was "'unable to work and disabled from a neuropsychological standpoint'" and "was having one seizure every month or every other month." Pl.'s Br. 3 (quoting R. 498). A treating source's *medical opinion* is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give such a medical opinion controlling weight, then he must consider the five regulatory factors "to determine what lesser weight should instead be accorded the opinion." *Brown*, 873 F.3d at 256; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). He also should "determine the extent to which a treating physician's legal

6

conclusion is supported by the record," but he is "under no obligation" to afford the conclusion "any heightened evidentiary value" simply because it came from a treating doctor. *Morgan*, 142 F. App'x at 722.

*

Derwin was diagnosed with a seizure disorder when he was a teenager. *See* R. 68–69, 84, 465, 612. He spent most of his career working full-time in jobs that involved heavy lifting or working around machinery. R. 67–68, 289, 297–302. On February 15, 2010, Derwin saw Dr. Owusu-Yaw at Danville Neurology Associates after having a breakthrough seizure at work. R. 439. He described the seizure as "an aura of a funny feeling in the extremity," R. 437, but noted he had enough time to turn off his machine before full onset, R. 439. His neurologic exam was normal "without evidence of disorientation, impaired concentration, memory, disturbance, language problem[,] or apraxia." R. 439. Dr. Owusu-Yaw added Tegretol to Derwin's "therapeutic" dose of Dilantin and ordered an EEG, R. 440, which showed "mild background slowing with no spike or epileptiform activity," R. 436. On April 7, Derwin was "doing well with the [T]egretol . . . and had no recurrent seizures, aura sensations, or syncope." R. 432. His normal neurologic exam was unchanged. R. 433. Dr. Owusu-Yaw cleared Derwin to return to work the next day. *Id.*

Derwin saw Dr. Owusu-Yaw again in July and August 2010, then switched to routine follow-up visits every six months in 2011, 2012, and most of 2013. R. 428–31 (July, Aug. 2010); R. 424–27 (Jan., July 2011); R. 419–23 (Jan., July 2012); R. 399–404 (Feb., Aug. 2013); *see also* R. 617 (Apr. 2013). On July 7, 2010, Dr. Owusu-Yaw noted Derwin's mental status revealed "[m]ild psychomotor slowing" on an otherwise normal neurologic exam. R. 431. He opined that Derwin should "be considered disabled from work . . . until he [was] 6 months seizure free, in

that he may not drive or operate machinery which could be life-threatening if a seizure occurred." R. 430. On August 12, he cleared Derwin to drive and return to work the next day. R. 428–29. For the next three years, Derwin always reported doing "well with no recurrence of seizures" and taking his anticonvulsants as prescribed. R. 399, 402, 419, 422, 424, 426. His neurological exams were normal except for the mild psychomotor slowing first noted in July 2010. R. 400, 402–03, 419–20, 424–25, 422–23, 426–27, 428–29.

On October 7, 2013, Derwin told Dr. Owusu-Yaw he had two seizures in the last three weeks, having lost his job around the same time. R. 397. Dr. Owusu-Yaw opined that the seizures were "likely due to compliance." *Id.* Dr. Owusu-Yaw's findings on exam remained unchanged, and he instructed Derwin to return in four months. *Id.* Derwin came back four weeks later to discuss his disability application. R. 393. "He stated [he] had 1 seizure a week prior to being [laid] off related to increased stress at wor[k]." *Id.* The seizures were "worse" when he was under stress or when he had to get up early in the morning. *Id.*; *see also* R. 394, 443–44, 453–54, 498–99, 495–96, 501–02, 530–31 (same). Derwin's neurologic exam was still normal except for mild psychomotor slowing. Dr. Owusu-Yaw assessed the seizure disorder as "stable," but increased the Tegretol for breakthrough activity. R. 394.

On March 5, 2014, Derwin told Dr. Owusu-Yaw he could not work with seizures, which he now had "about" once a month. R. 443. Dr. Owusu-Yaw assessed Derwin's seizure disorder as "unstable about 1x a month" on Tegretol and Dilantin, and noted he would add Vimpat to see if that reduced the frequency of the breakthrough seizures. R. 444. In April, Derwin reported having one seizure on March 13 "when [he] did not get enough sleep," and another ten days later while he was taking a shower. R. 453–54. "No severe injurie[s]" were reported. R. 453. In mid-August, Derwin reiterated that he could not "work with seizures," which he had "about" once "a

month [or] every other month." R. 501 ("Patient is unable to work and is disabled."). His

neurologic exams on all three visits were still normal except for mild psychomotor slowing. R.

444, 454, 502. In August, Dr. Owusu-Yaw increased the Vimpat and told Derwin to follow up in

six months. R. 502–03.

Derwin and his mother returned in early December 2014. R. 498. They discussed

Derwin's "weekly seizures and the impact of stresses" on the disorder. *Id.*; *see* R. 499 ("Seizure

disorder unstable about 1x a month previously and now 1/week" on Tegretol and Vimpat). A

note in the "History of Present Illness" section reads, "Patient is unable to work and is disabled

form [a] neuropsychological standpoint." R. 498. Dr. Owusu-Yaw's finding on exam remained

unchanged. R. 499. Derwin and his mother also said he recently had a psychological evaluation

that raised "bipolar disorder concerns" and "mood and anger issues." R. 498; *see* R. 465–73. Dr.

Owusu-Yaw suggested he see UVA Neurology "to exclude [a] component of PNES," R. 498, or

psychogenic nonepileptic seizures, R. 34.

By April 2015, Derwin's seizures had improved from "weekly" to "monthly." R. 495.

His neurologic exam was completely normal "without evidence of disorientation, impaired

concentration, memory, disturbance, language problem[,] . . . apraxia," or psychomotor slowing.

R. 496. Dr. Owusu-Yaw assessed his seizure disorder as both "stable" and "unstable about 1x a

month" on Tegretol and Vimpat, and instructed Derwin to return in one year "as needed and if

signs or symptoms worsen or persist." R. 496–97. In April 2016, Dr. Owusu-Yaw recorded the

same reported symptoms, normal findings on exam, and mixed assessment of Derwin's seizures.

*See* R. 530–31, 532 (adding diagnosis of epileptic syndrome with complex partial seizures). Dr.

Owusu-Yaw refilled his anticonvulsants and told him to follow up in one year. R. 532. Derwin

told other providers that he had two grand mal seizures later that year, but he did not report them to Dr. Owusu-Yaw. *See* R. 567, 573, 595.

* *

ALJ O'Hara gave "little weight to Dr. Owusu-Yaw's multiple disability endorsements," including that Derwin was "disabled from a neuropsychological standpoint," in part because they related to an issue reserved to the Commissioner. R. 35 (citing R. 443, 453, 495, 498, 501). The "conclusory" endorsements also found "little support" in the neurologist's generally normal findings on neuropsychological exams throughout the relevant period and were inconsistent with the "conservative" treatment he prescribed, R. 35, and his failures to pursue diagnostic testing or restrict Derwin's driving at any time after March 2010, R. 33. *See also* R. 32–35 (citing R. 80, 315, 335, 393–96, 399, 402, 419–31, 436, 443–44, 453–54, 495–503, 530–32, 595). Derwin counters that the ALJ should have given Dr. Owusu-Yaw's statement controlling weight because he made it "in the context of" treating Derwin and "in light of [his] numerous problems," and it was "supported by clinical signs and . . . not inconsistent with other substantial evidence." Pl.'s Br. 3. In support, he asserts Dr. Owusu-Yaw "continually noted that [Derwin's] disorder was unstable as demonstrated by the frequency of recurring seizures." *Id.* (citing R. 444, 457).[7]

This argument misunderstands the governing regulations. *See Candi L. v. Comm'r of Soc. Sec.*, No. 4:17cv30, 2018 WL 7690318, at *12 nn.8–9 (W.D. Va. July 31, 2018), *adopted by*

---

[7] Pages 444 and 457 are identical copies of Dr. Owusu-Yaw's March 4, 2015 progress note. Derwin also cites his and his mother's hearing testimony in which they described Derwin having five seizures a day, lasting six to eight minutes each, with residual effects lasting four or five hours before Derwin was back to normal. Pl.'s Br. 3–4 (citing R.69–73, 85–88). ALJ O'Hara rejected their testimony as "not consistent with the longitudinal record," including that Derwin did not have any emergency-room visits or diagnostic tests during the relevant time, had "not received the sort of medical treatment an individual who is experiencing up to 5 seizures a day would ordinarily be expected to receive," and had no restrictions on his driver's license. R. 35. Derwin does not challenge those findings on appeal. *See* Pl.'s Br. 3–6.

2019 WL 1264890, at *2 (W.D. Va. Mar. 19, 2019); *Russell v. Colvin*, No. 7:15cv434, 2017 WL

818608, at *4 (W.D. Va. Jan. 31, 2017). To start, Dr. Owusu-Yaw's statement is a legal

conclusion, not a medical opinion. *Morgan*, 142 F. App'x at 722; 20 C.F.R. §§ 404.1527(d),

416.927(d). Thus, it is not entitled to special (much less controlling) weight simply because he

made it while treating his patient. *See id.* ALJ O'Hara also explained that Dr. Owusu-Yaw's

statement found "little support" in the record, most notably the neurologist's overwhelmingly

normal findings on neuropsychological exams, the "routine, conservative, and unremarkable"

treatment he prescribed, and the fact that Derwin drove without restriction, which indicated "his

seizure disorder is not debilitating." R. 35. The regulations required nothing more. *Morgan*, 142

F. App'x at 722.

Finally, ALJ O'Hara gave specific, legitimate reasons for discounting Dr. Owusu-Yaw's

opinion that Derwin was disabled. *See Mark S. v. Berryhill*, No. 7:17cv312, 2018 WL 4441519,

at *6 (W.D. Va. July 6, 2018) (ALJ reasonably relied on "consistently normal" findings on

claimant's physical and mental examinations and the "conservative" nature of treatment, which

was limited to prescription medication, in concluding claimant's seizure disorder was not

disabling), *adopted by* 2018 WL 4431405, at *5 (W.D. Va. Sept. 17, 2018); *cf. Hicks v. Comm'r*

*of Soc. Sec.*, 105 F. App'x 757, 763 (6th Cir. 2004) (claimant whose seizure disorder limited her

ability to drive was not necessarily disabled); *Barger v. Berryhill*, No. 2:16cv11, 2017 WL

4127658, at *9 (W.D. Va. Sept. 18, 2017) (claimant who had "multiple" complex partial seizures

each month was not necessarily disabled). Those reasons are amply supported by the record. *See,*

*e.g.*, R. 433, 439, 496, 531 (recording normal neuropsychological exams); R. 394, 397, 400,

402–03, 419–20, 424–25, 422–23, 426–27, 428–29, 444, 454, 499, 502 (noting only "mild

psychomotor slowing" on otherwise normal neuropsychological exams); R. 436 (noting mild

abnormalities on March 2010 EEG); R. 430, 433 (clearing Derwin to drive and return to work in

April and August 2010); R. 394, 444, 496–99, 502–03, 531–32 (continuing or adjusting

Derwin's prescription medications). Derwin challenges only ALJ O'Hara's finding that the

statement was at odds with Dr. Owusu-Yaw's "conservative" treatment recommendations and

failures to refer Derwin for an MRI, CT scan, or another EEG. *See* Pl.'s Br. 4. He recognizes,

however, that "it is not clear from the decision that more 'aggressive' treatment was indicated or

thought necessary." *Id.* This is precisely why an ALJ may rely on a claimant's "conservative

treatment" as one factor in the disability determination: when a claimant or his doctor states that

his "alleged disability is so bad that []he is unable to work in any job whatsoever, but the ALJ

finds that the treatment is not as aggressive as one would reasonably think would be employed if

the alleged disability were actually that severe, then it is reasonable for the ALJ to conclude that

the conservative treatment bears on the [statement's] credibility." *Dunn v. Colvin*, 607 F. App'x

264, 271 (4th Cir. 2015). As ALJ O'Hara pointed out, one would at least expect Dr. Owusu-Yaw

to order an MRI or another EEG if he thought Derwin's seizure disorder was disabling. *See* R.

33–34. And, contrary to Derwin's suggestion, *see* Pl.'s Br. 4, ALJ O'Hara "was under no

obligation to list the types of medical treatment that may support a more restrictive RFC

determination" or persuade him that Derwin's seizure disorder was disabling, *Mark S.*, 2018 WL

4431405, at *5.

B.     *Dr. Storch & the DDS Physicians*

Derwin also argues that ALJ O'Hara did not give the "appropriate" weight to Dr.

Storch's opinion about Derwin's seizure-related limitations and improperly gave "more weight"

to a DDS physician's opinion that he had "moderate" overall limitations with social functioning

and maintaining concentration, persistence, and pace. Pl.'s Br. 4–5 (citing R. 133, 465–73). ALJs

use the same regulatory factors when weighing medical opinions from examining and non-

examining sources. While an examining source's medical opinion may deserve more weight

when based on her observations of the claimant, an ALJ may rely on a non-examining source's

medical opinion

> [W]here that opinion has sufficient indicia of "supportability in the form of a high-
> quality explanation for the opinion and a significant amount of substantiating
> evidence, particularly medical signs and laboratory findings; consistency between
> the opinion and the record as a whole; and specialization in the subject matter of
> the opinion."

*Woods*, 888 F.3d at 695 (quoting *Brown*, 873 F.3d at 268); *see* 20 C.F.R. §§ 404.1527(c)(3),

416.927(c)(3). The court "must defer to the ALJ's assignment of weight" among differing

medical opinions unless his underlying findings or rationale "are not supported by substantial

evidence" in the record. *Dunn*, 607 F. App'x at 271; *see Monroe v. Colvin*, 826 F.3d 176, 190

(4th Cir. 2016).

*

Clinical psychologist Emilie Storch, Ph.D., saw Derwin (and his mother) for a

consultative psychological exam in September 2014. *See* R. 465–73. His mother was the primary

historian during their interview. R. 472. When Derwin spoke, he was "extremely slow" to

answer, often struggled to find the right words, and "displayed much memory loss." R. 469; *see*

R. 470. His mother described Derwin's memory problems, inattentiveness, expressive

communication issues, sensory deficits, cognitive decline, impulsivity, and impaired emotional

and social functioning. R. 467, 471. Dr. Storch found these symptoms consistent with bipolar

disorder and traumatic brain injury ("TBI"), R. 465, 469, and noted several times in her report

that Derwin tried to "justify" or "explain them away" during their interview, R. 467–72. *See also*

R. 383. On exam, Derwin had significant difficulty reporting his personal history (e.g., his place

13

of birth, sibling's names and ages), but no trouble doing serial sevens, spelling the word "world"

backwards, reciting the months in reverse order, and naming the four most recent U.S.

presidents. *See* R. 468–70.

Dr. Storch opined that Derwin "could not work consistently nor complete a normal work

week . . . without interruptions form seizures" and "may need special supervision," which he

"likely would accept" notwithstanding that he "would have great difficulty interacting with

coworkers" and "cannot deal with the usual stressors encountered in competitive work." R. 473.

*See also* R. 472 ("[H]is neurologist says he cannot function in a job. The seizures make it

difficult for individuals to hire him, but it is also dangerous for him to have seizures on the job

and they are not controlled. . . . Derwin does not have the ability to perform either detailed or

simple tasks due to epilepsy according to his physician."). Derwin's "significant" TBI symptoms

"also would keep him from working [e]ffectively" because he had "difficulty remembering" and

"cannot . . . keep up the pace" to do competitive work. R. 473.

Psychiatrist Barry Rudnick, M.D., and neurologist Michael Miller, M.D., reviewed

Derwin's records for DDS in October 2014. *See* R. 133, 137–39, 152, 156–58, 160, 463–64. Dr.

Rudnick opined that Derwin's severe mental impairments caused "moderate" difficulties in his

overall social functioning and ability to maintain concentration, persistence, or pace, R. 133, 152,

and "moderate" limitations in his capacities to understand and remember detailed instructions,

maintain attention and concertation for extended periods, sustain an ordinary routine without

special supervision, interact appropriately with the general public, and be aware of normal

workplace hazards, R. 137–39, 159–58. Nonetheless, he concluded Derwin could "understand

and remember three step instructions"; perform simple, routine tasks; "persist, attend, and

maintain [an] acceptable pace" for a normal work schedule; and "adapt to expect[ed] workplace

changes." *See* R. 129, 148, 138–39, 159–58. "Due to cognitive issues he may need additional

supervision when learning new tasks" and "should avoid work hazards unless all appropriate

safeguards are in place." R. 138–39, 157–58. Dr. Miller agreed that Derwin "should be able to

perform various jobs that do not require [him] to be in dangerous surroundings" as long as he

kept taking his seizure medications. R. 141, 160; *see* R. 136–37, 155–56.

*

ALJ O'Hara gave three reasons for affording "little weight" to Dr. Storch's assessment.

First, Dr. Storch seemingly "based much of her opinion on limitations that she believed to have

been attributable to a neurological disorder, rather than to conditions that, as a psychologist, she

would be expected to be able to diagnose and evaluate with special authority." R. 35–36 (citing

R. 131 ("[T]he consulting psychologist mentioned limitations due to a [neurological] impairment

as well as [mental] impairments."). Second, Dr. Storch only examined Derwin one time, and

some of her observations "about his behavior and mental functioning," including that he

"exhibited an extremely deficient memory" and took "an inordinate amount of time to answer

questions," conflicted with other providers' consistently normal findings on mental status exams,

R. 36 (citing R. 393–94, 396–97, 399–400, 402–03, 419–40, 443–44, 453–54, 495–96, 498–99,

501–02, 530–31, 578). Finally, parts of Dr. Storch's opinion appeared to echo Dr. Owusu-Yaw's

disability endorsements rather than being based on her own exam findings. *Id.* (citing R. 472).

ALJ O'Hara "generally adopted" Dr. Rudnick's and Dr. Miller's opinions because they were

"reasonably consistent with the objective medical evidence in the record," including that Derwin

received "conservative" treatment for his psychiatric and neurological disorders. *Id.*; *see* R. 35.

His RFC finding tracks their opinions (as relevant here) by limiting Derwin to "simple, repetitive

work that does not require working with the public." R. 31.

On appeal, Derwin asserts only "that Dr. Storch's observations and opinions were a result of her evaluating and diagnosing [him] with special authority and expertise." Pl.'s Br. 5. He does not point to any specific evidence that supports his position or, more importantly, that ALJ O'Hara overlooked in concluding that the DDS psychiatrist and neurologist who reviewed Derwin's records were in better positions to assess his cognitive limitations than was the clinical psychologist who examined him one time. *See* R. 35–36; 20 C.F.R. §§ 404.1527(c)(5)–(6), 416.927(c)(5)–(6). Derwin also does not challenge ALJ O'Hara's other findings that Dr. Storch's observations on that exam contrasted starkly with other providers' overwhelmingly normal findings on exams throughout the relevant period and that parts of her assessment relied Dr. Owusu-Yaw's statements that Derwin was disabled, which the ALJ subsequently rejected as inconsistent with the neurologist's own treatment notes and recommendations. R. 36. Those were legitimate reasons to discount Dr. Storch's medical opinion, 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4), and they are amply supported by the record. *See, e.g.*, R. 129–30, 393–403, 443–44, 453–54, 472, 495–503, 530–31, 567, 578.

Additionally, although ALJ O'Hara did not expressly find that Dr. Storch's opinion "was based on [Derwin's] depiction of his seizures," Pl.'s Br. 5, he did reject Derwin's and his mother's testimony about the seizures' frequency, intensity, and debilitating effects as inconsistent with specific, relevant evidence in the record. R. 32, 35. Derwin does not challenge that aspect of ALJ O'Hara's decision on appeal. *See* Pl.'s Br. 3–5. Thus, the fact that Derwin's "depiction [in Dr. Storch's report] matched the evidence in the record from both Dr. Owusu-Yaw and his mother," *id.* at 5, only bolsters ALJ O'Hara's rationale for giving Dr. Storch's opinion less weight. *Cf. Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, (4th Cir. 2014) (ALJ did not err in rejecting treating physician's "opinion and speculation" where ALJ specifically noted "the

opinion appeared to mirror" claimant's description of his limitations, but was inconsistent with "the conservative nature of [his] treatment[] and the generally normal findings during physical examinations").

Derwin does not identify any reversible error in ALJ O'Hara's RFC analysis or "point to *any* specific piece of evidence not considered by the [ALJ] that might have changed the outcome of his disability claim." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Instead, he urges the Court to reweigh the same medical exhibits ALJ O'Hara already considered, and to conclude that he should have found Derwin's seizure disorder disabling. The Court's role is "to determine whether the ALJ's decision is supported as a matter of fact and law. There were a number of conflicts in the evidence here, and [I cannot] second guess the ALJ in resolving those conflicts." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). ALJ O'Hara's decision and rationale are supported by substantial evidence and therefore the decision should be affirmed.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Plaintiff's Motion for Summary Judgment, ECF No. 16, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 17, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: March 17, 2020

Joel C. Hoppe
United States Magistrate Judge